[Civ. No. 3368. Third Appellate District—December 14, 1927.]

WONG KIT, Respondent, v. CRESCENT CREAMERY COMPANY (a Corporation), Appellant.

564

W. I. Gilbert, for Appellant.

Harry M. Irwin for Respondent.

HART, J.—This is an action for damages in the sum of twenty-five thousand dollars for the death of plaintiff's minor son, Wong Fook Sam, who, it is alleged, was killed through and by the negligent act of an employee of the defendant. By their verdict, the jury, by whom the case

was tried, awarded plaintiff damages in the sum of five thousand five hundred dollars, for which amount judgment was entered in his favor.

The appeal, supported by a bill of exceptions, is by the defendant from the judgment so entered.

At the time of the accident resulting in the death of the child the defendant was engaged in the creamery business in the city of Los Angeles. The salient allegations of the complaint are:

"That on September 25, 1922, in the conduct of its business as aforesaid, the defendant maintained and operated an auto delivery truck upon and along Los Angeles street, near Ferguson alley, in said city of Los Angeles;

"That on September 25, 1922, while so operating said auto delivery truck toward the north upon and along said Los Angeles street across and near the intersection of said Los Angeles street with said Ferguson alley, defendant so negligently and carelessly managed and operated said truck at said time and place that said truck violently ran against, struck, knocked down, mortally injured and killed said Wong Fook Sam, said minor son of plaintiff; and that, by reason of the negligence, carelessness and violence of defendant as aforesaid and as the proximate result thereof, said Wong Fook Sam was struck, knocked down, mortally injured and killed by defendant at said time and place;

"That at the time of the killing and death of said Wong Fook Sam, said minor son of plaintiff, as aforesaid, said Wong Fook Sam was of the age of nine years and two months, . . . was strong, healthy and robust, and was a source of great comfort, cheer and assistance to plaintiff; and that, by reason of the killing and death of said Wong Fook Sam as aforesaid, plaintiff has been totally and forever deprived of the society, comfort, protection and services of his said minor son and has been required to pay and has paid more than $175 for the funeral and burial expenses of said minor son; . . .

"That at all times herein mentioned said Los Angeles street and said Ferguson alley, at all the places herein mentioned, were and each of them was a public highway, used and occupied by the public in passing and repassing

thereon with automobiles, horses, wagons and other conveyances, and on foot.''

The answer denies the material averments of the complaint and pleads contributory negligence upon the part of the deceased and also on the part of the plaintiff, the father of the deceased. As to the charge that the deceased was guilty of contributory negligence which, it is alleged, was the proximate cause of the accident in which the minor lost his life, the answer avers that he (said minor) ''did not exercise ordinary care or any care at and about the time and place of the accident; did not look for approaching vehicles, or do any other act to protect himself or his person from injury.'' The claimed negligence of the plaintiff, which it is also alleged contributed to the accident and its very serious consequences, and which, it is further charged, constituted the proximate cause of the death of the boy, consisted in the negligent failure of the plaintiff, as father of the deceased, to ''exercise ordinary care or any care in keeping said minor out of places of danger,'' the thoroughfare upon which the accident occurred being, as in the present connection the answer alleges, ''a public street, travelled at all times in the day ,and night with automobiles, automobile trucks and all character of commercial conveyances.''

The points made for a reversal, as they are specifically set forth in the brief of the defendant, are: 1. That the evidence does not show that the defendant's employee (the operator of the truck which collided with the boy) was guilty of negligence; 2. That, assuming that said ''employee was negligent, then the evidence disclosed that the deceased contributed to his own injuries in attempting to cross the street by running in front of the appellant's truck''; 3. That, even if the evidence showed that the defendant's employee was negligent, the plaintiff himself was guilty of contributory negligence which proximately caused the injuries which caused the death of the minor ''by permitting his son to attempt to cross the street running in front of the moving truck driven by appellant's employee''; 4. Errors in the instructions.

It is perhaps well first to describe more specifically than it appears to be explained in the complaint the exact location of the point at which the accident happened. Los

Angeles Street, in the city of Los Angeles, runs in a northerly and southerly direction. Plaza Street (running in an easterly and westerly direction) connects with Los Angeles Street at the western line thereof. For a short distance Plaza Street is substantially bordered by a small park or plaza, from which, presumably, said street derived its name. Ferguson Alley (running in an easterly and westerly direction) intersects Los Angeles Street at the east line thereof, and is directly east of Plaza Street and is the passageway for those traveling east on Plaza Street towards Los Angeles Street who may choose to enter the street paralleling Los Angeles Street on the east without turning either south or north on the last-named street to do so, and also for those desiring to pass from the street paralleling Los Angeles Street on the east across the last-named street to Plaza Street without ''going around the block.''

The accident in which the boy lost his life happened, as the complaint alleges, on the twenty-fifth day of September, 1922, about (as the evidence shows) two o'clock P. M., on the street and at the place stated in the complaint. The lad, then of the age of nine and a half years, was a pupil in both the American and the Chinese schools of the city of Los Angeles, his attendance at the first named school being in the forenoon and his attendance at the Chinese school in the afternoon of each day. At the time of the accident the deceased was on his way to the regular afternoon session of the Chinese school. When struck by defendant's truck, the boy was in the act of crossing Los Angeles Street from the west side thereof, or from Plaza Street toward Ferguson Alley. At the same time, the truck was being operated by defendant's employee in a northerly direction on Los Angeles Street.

The plaintiff who, as the complaint states, was the father of the deceased, was, at the time of the accident, employed in a Chinese store conducted under the name of the ''Far East Company,'' This store was located on or near the corner of Los Angeles Street and Ferguson Alley.

Strangely as it may seem after reading the statement of the several points urged here by the defendant for a reversal and enumerated above, the opening brief of its counsel contains the following admission:

"The disputed facts of the case resolve themselves into the question of whether the deceased himself heedlessly attempted to cross the street by running in front of the automobile and placing himself in a position of danger, without any negligence on the part of appellant's employee. Also, whether, notwithstanding any negligence on the part of appellant's employee, the deceased himself was guilty of contributory negligence; and the further disputed fact as to whether or not the deceased's father was guilty of contributory negligence."

Upon the foregoing statement in the brief, we might warrantably waive all consideration herein of the evidence, in so far as it affects the points made here by the defendant that the evidence shows that the accident was directly occasioned by the boy's own negligence and that of his father, and that it fails to show that the driver of the truck was negligent, but assuming that it does, such negligence was not the direct or efficient cause of the fatal injuries to the boy. But the discussion in defendant's brief has led us to the conclusion that its counsel went further in said statement than he intended to go, and we will, therefore, consider herein the question whether we can properly say, as a matter of law, that the argument of counsel that the verdict cannot stand because there is no evidence to support it for any of the reasons urged by counsel for the defendant after making the statement referred to is or is not maintainable.

This appeal is the culmination of a second trial of this action.

The section of Los Angeles Street in which the truck driver was operating the truck is a business street and ordinarily characterized by a heavy automotive traffic. At the time, however, that the truck driver was approaching the point where the accident occurred and at the very time of the accident, there was no other automobile traveling over the street in either direction in that particular section, nor was there then any other person using the street in any manner, in that immediate vicinity. All the witnesses that saw the collision, including the driver of the truck himself, so testified; nor, as the same witnesses and the operator of the truck testified, was there any obstruction of any character between the driver of the truck

and the boy, as the former was approaching the latter as he was crossing Los Angeles Street, for a distance of over one hundred steps from the truck to the point at which the accident happened. All the witnesses are as one upon the fact that the boy, proceeding easterly across Los Angeles Street from Plaza Street, had traversed a distance approximately of forty feet, or to be more explicit, had reached a point a short distance beyond the center line of Los Angeles Street, going east, when he was struck by the truck. There is testimony (uncontradicted) that the truck, just before and when it struck the child, was traveling northward and to the right or east of the center line of Los Angeles Street. The deceased at the time was, therefore, proceeding toward the point at which the collision took place from the left of the truck driver. The boy was struck by the right fender of the truck.

The plaintiff testified that, knowing that his child daily passed the store at which he (plaintiff) was employed in the afternoon, about 2 o'clock, on his way to the Chinese school, he always looked or watched for the boy's appearance at or near the store at the hour stated of each day. On the day the fatal injuries were received by the child, and as the hour of 2 o'clock P. M. was in near approach, he now and then would look through a window of the store from the inside thereof toward Plaza Street where it intersects Los Angeles Street, and, at the usual time, would see his son at the corner of the two streets just named. On the day of the accident, the plaintiff, looking through the window at the usual time, observed the boy as he reached the intersection of the two streets referred to, and he thereupon stepped out to the sidewalk from which he saw the boy as he left the curbing or the west side of Los Angeles Street, and watched him as he was proceeding across said street toward the store or Ferguson Alley. Plaintiff further testified that the boy was walking at his usual gait until he arrived at a point a little beyond the center of Los Angeles Street, when he (the boy) increased his speed—that is, to use the language of the witness, the boy "stepped over the street about two or three fast steps," when the truck struck him. "The automobile," said the plaintiff, "was about ten steps away (or between twenty-eight and thirty feet) from the boy at the time

he (the boy) commenced to take those two or three fast steps. . . . The right wheel on the right side hit the boy." The plaintiff said if the boy "had been able to get up one step further, he would have been clear past the machine." He further testified that he did not holloa at the boy to warn him of the approach of the truck because the truck was then a considerable distance south of where the child was crossing the street, "and that the truck was then the only vehicle in said street." Plaintiff testified that the operator of the truck at no time sounded the horn attached to the truck or gave any other signal of his approach as he was proceeding toward the point at which the accident occurred. He further testified that he knew that Los Angeles Street "was a very heavily traveled street up there, so far as trucks and automobiles are concerned," and that he had warned his boy "to watch for the cars and not pass when a car was coming." In other words, continued the plaintiff, "I told him about the danger from these cars and he said he understood that." Plaintiff also stated that he had instructed the boy "to come to my place" when he (the boy) was on his way to the Chinese school.

One Chan Jin testified that he witnessed the accident, having just prior thereto stepped out of his place of employment, situated near the point of the collision, to the sidewalk. He saw the boy as he started across the street in the direction of Ferguson Alley; that he observed the truck traveling from the south toward the point where deceased was crossing the street, and that, when the truck was about twenty-four feet from the boy, he noticed that the latter started to run, going east or toward the alley referred to. The truck, said the witness, "sounded like a truck going with a big noise. There was no horn or whistle blown by the truck." The witness stated that, after the boy started to "run fast," there was no diminution in his speed until he was struck.

A Chinese named Wong Hing saw the accident. He was at the time walking along the sidewalk on the north side of Ferguson Alley, east of Los Angeles Street, and near the intersection of said alley with said street; that he first observed the boy walking east and in about the center of Los Angeles Street; that he also saw the truck traveling

from the south toward the point where the boy was then walking; that, "when the truck was about ten steps from the boy, the latter was coming here (to the east sidewalk) from the middle of the street, and the boy was in front of the machine, and he started fast steps. And finally the boy get struck at the left, on the right side. . . . When I first saw the boy, he was walking the ordinary way, in ordinary walk." Cross-examination: "In the danger time the boy run fast. When the boy started to run from the middle of the street he stepped off about three or four steps. (Witness indicating, it being stipulated by counsel that as indicated the boy, when he started to run or 'step fast,' was at a point about halfway from the center of the street to the sidewalk on the east side.) The boy," proceeded the witness, on cross-examination, "ran one or two steps. The truck then went about twenty-four to twenty-seven feet, while the boy was running two feet and a half. After it hit the boy it stopped about twenty foot-steps."

The defendant's witness, J. L. Firebaugh, testified that he witnessed the accident; that, when he first noticed the boy, he (witness) was approximately seventy-five yards from the boy, the latter then being on the west side of Los Angeles Street; that he did not see the boy when he stepped off the sidewalk; that the boy was running east across Los Angeles Street, "at a fairly good clip"; that "the boy was looking over his shoulder, back toward the plaza over his left shoulder. That," said the witness, "is why I particularly noticed that boy. . . . He did not stop running until the truck hit him. . . . From the time I first saw the boy until the automobile struck him, he had run past the center of the street." On cross-examination, the witness admitted that at the coroner's inquisition into the circumstances of the killing of the deceased, held within a few days after the fatal accident, and "while the facts were still fresh in his memory," he testified that he "only saw him (the deceased) run two or three steps"; that when he first saw said deceased, the latter was "in front of the truck" and "within three or four steps of where the truck hit him." The witness testified that the testimony given by him at the coroner's inquest and contained in the tran-

script of the proceedings before that officer constituted a correct description of the circumstances of the accident.

W. H. Atwood, operator of the truck at the time it struck the boy, testified: That he was route foreman of the defendant and that the accident happened about 2 o'clock in the afternoon. "I was driving north on Los Angeles street," he said, "I do not remember how far from the curb I was—well, I was to the right of the middle of the street, I know that. I first saw the boy when he was about six feet—four or six feet, right somewhere in front of the radiator cap of the machine. That was when I first saw him. As soon as I saw him, I swung the truck to the left and grabbed for the brakes, trying to miss him. I struck him with the right fender. I did stop my car, just as soon as possible. I was not over one or two truck lengths, I don't think. . . . I was traveling about twelve miles an hour. . . . When the boy was first seen by me, he seemed to be running, kind of looking back. He seemed to be looking over his right shoulder. That was not towards me; he was not looking toward me with (over?) his left shoulder."

Cross-examination: "I had driven an automobile many times before this accident up and down Los Angeles street, in that vicinity. I passed there several times a day in my business. I knew that that was a very busy street. I had reason to expect at any time there a great deal of traffic, both of automobiles and on foot. As I passed up this street, on this particular day, from the time I passed this hay market until I reached that corner, there was nothing very close in the way of traffic. As far as I remember there wasn't any automobile or other person in the street from this point in the vicinity of the hay market or substation until I reached that corner. There was nothing in the street, of any kind, so far as I remember, to attract my attention away from the operation of my machine. I was coming along there about twelve miles an hour. The first I saw of the boy was when my radiator cap was within four to six feet of the boy; I never saw him before at any time, up until that time. There was nothing the matter with my eyes at that time; I have good eyesight. Operating my truck at the rate of twelve miles an hour, I don't know how quickly I could have stopped it under

ordinary conditions; not as quick as I did then, I know. I don't hardly think I could have stopped it in eight or ten feet, with a loaded truck. I could have slowed it down. I don't know that I could have brought it to a standstill in that distance but I think I could have slowed it down to at least half of the speed or more, within that distance. I don't know how fast the boy was running. I can't say that I remember now whether he seemed to be gaining speed or to be starting up faster during that small intermission of time that I saw him there before the truck hit him. I testified at the coroner's inquest within two or three days of this accident. I did testify as follows: 'Q. Did the child make any effort to get out of the way? A. He was going toward the sidewalk. Q. Did he hurry his steps any when you were six feet from him? A. He seemed to start a little faster. Q. When you struck him, was he walking or running? A. He seemed to be running. Q. He seemed to quicken his steps at that time? A. He must have heard the machine coming.' . . . I don't remember to have said anything about the boy having his head turned away from the machine at the coroner's inquest, or at the other trial of this case. Mr. Gilbert (attorney for defendant): I don't think he was asked about it at all, as far as I recall. I don't remember it. Mr. Irwin (attorney for plaintiff): I will stipulate that he was not asked, and that he did not say anything about it. That may be taken in place of reading the whole testimony? Mr. Gilbert: Yes. Q. By Mr. Irwin: There is no reason that you can assign now why you failed to see the boy before you got to that point within four to six feet from him, is there? A. No, sir. . . . As far as I remember there was nothing in that street between me and the boy from the time I left this place down at the hay market up to the time I struck him. My machine continued at the same rate of speed, as far as I can tell, from the time I left the hay market until I got within four to six feet of the boy. When within four to six feet of the boy is when I put on my brakes for the first time."

Called in rebuttal by the plaintiff, Chan Jin testified that he at no time saw the deceased turn his "head back over his shoulder to look toward the west"; that, as he stated when testifying for plaintiff when first called in

the case as a witness, he first saw the deceased "in the street, on the other (west) side, and he was still walking."

The foregoing embraces a statement in substance of all the facts to which the witnesses both for the plaintiff and the defendant testified. It is clear that, under the testimony, the alleged contributory negligence of the plaintiff and the asserted ·like negligence of the deceased were questions for the jury to determine. It is perfectly· clear that the jury's conclusion that there was no ground for imputing to the plaintiff culpable blame for the accident is conclusive upon a reviewing court. The basis, and, so far as we are able to discern from the record, the only basis for attributing to plaintiff responsibility for the accident, rests in the fact that the plaintiff permitted the boy to walk along and on the public streets unattended by some older person who was able to protect the child from the constantly menacing hazards incident to the heavy automotive traffic of such thoroughfares. But the uncontradicted evidence discloses that the deceased was not only physically robust, healthy, and active, but was intelligent and of excellent judgment for one of his years. The boy, at the time that he was fatally injured, was on his way to school, which, unattended, he had previously been accustomed to doing, and generally, as may be implied from the evidence, taking the same route and always, as the plaintiff instructed him to do, passing the store in which his father was employed; that the latter had warned the boy to be careful in passing over and along the streets, particularly Los Angeles Street, because of the unusual automotive traffic always on said street, and that the boy in effect said to his father in answer to such warning that he (the boy) understood the situation with respect to the hazards to a pedestrian of such traffic. Moreover, the plaintiff testified that, when the boy started to "step fast" or run, he then being, as plaintiff also testified, approximately eleven or twelve feet from the curbing on the east side of the street, the truck was about forty steps from the boy. Under those circumstances, there being nothing to prevent the driver from seeing the deceased had he looked ahead of him, the plaintiff had the right to assume that the operator of the truck did see the boy and would slacken the speed of the truck before reaching the point where the

boy was walking. It may here be added that, although the record is silent as to the location of the Chinese school attended by the boy, it may properly be assumed from the fact that, in going to said school, it was his daily custom to pass along Plaza Street and thence across Los Angeles Street, past the Far East Store, that the route thus taken by the deceased was the nearest or most convenient one for him to follow to get to said school. ▆ But however that may be, as in effect before stated, it was not negligence *per se* on the part of the plaintiff to permit or even authorize the boy to use the streets mentioned to get to his school, and it is clear that the record furnishes no ground justifying the declaration by this court that the jury arrived at an erroneous conclusion in finding from the evidence that the plaintiff was not guilty of culpable negligence in doing so.

▆ As stated, the alleged contributory negligence of the deceased presented a question for the jury's solution. As to this, the claim is that the boy, without looking either north or south while crossing Los Angeles Street to see whether any vehicle was from either direction approaching the point where he undertook to cross said street, ran in front or "entered the path" of the truck. There is, as seen, evidence from which the jury was authorized to conclude that the boy started to walk from the west to the east side of the street, and, on reaching a point near the center line of the street, suddenly quickened his steps, some of the witnesses saying that "he ran" and some that "he walked fast." Undoubtedly, the act of accelerating his speed when he arrived at the center line of the street was caused by some reason or some purpose which suddenly occurred to him, and clearly the jury could very properly have concluded from all the circumstances that the act of increasing his speed was due either to his seeing the truck or hearing the noise of the machine as it was nearing him, and that the deceased conceived and believed that, under the circumstances, that was the best and safest course he could take to protect himself against being run into or struck by the truck. What is said in the following excerpt from the opinion in *Varcoe* v. *Lee*, 180 Cal. 338, 340, 341 [181 Pac. 223], in which the party fatally injured was a

child and the facts as shown by the evidence were very similar to those of this case, applies with equal force to this:

"The claim that the child was guilty of contributory negligence is based on the fact that she ran across the street instead of walking and was looking the other way when she got in front of the car. There was testimony that she was seen waiting on the left-hand side of the street, with relation to the chauffeur, for some wagons and a street-car going north to pass, and that as soon as they passed she started to run across the street. Not improbably she ran across thinking it the safest way to get across. Certainly, there is nothing to justify taking from the jury the question as to whether or not her conduct amounted to contributory negligence, particularly in view of her youth."

In the present case there is at least a conflict in the evidence upon the question whether the boy, as he started to run and did run while he was crossing the street, was looking over his left shoulder and in an opposite direction from that in which the truck was going, or whether he looked back at all. The question was for the jury to determine.

■ We now reach the question of the alleged negligence of the defendant's employee—the driver of the truck. All the witnesses, as seen, testified that immediately prior to and at the time of the accident, the street in the section of Los Angeles Street where the disaster happened was absolutely free from obstruction of any character; that, when the truck was approaching the point where the deceased attempted to cross the street, there was no automobile or other vehicle or person between the truck and the boy; that, in other words, it is shown that the vision of the driver of the truck, for a distance of several hundred feet from the point where the boy was in the act of crossing the street, was wholly unobstructed. Indeed, the operator of the truck himself, in response to a question propounded by the attorney for plaintiff, frankly stated that he could give or assign no reason why he did not see or should not have seen the boy long before he arrived at the point where first he observed the child in the street, to wit, a distance of from four to six feet from the latter. There is evidence, uncontradicted, that the driver at no time sounded a horn or gave any other warning of his approach toward the deceased.

It is not further necessary analytically to discuss the testimony to justify the acceptance by this court of the result arrived at by the jury. The defendant out of his own mouth convicted himself of negligence in failing to avoid striking the boy; for, whether he did not, under the circumstances as shown by the evidence, observe the boy in the act of crossing the street at a sufficient distance to have stopped his truck before reaching the point at which the collision occurred or, seeing the boy at such a distance and all the time up to the moment that the latter was struck, proceeded on the assumption that the deceased would pass the path of the truck before it reached him, in either case he was guilty of negligence and the jury were warranted in so finding. The deceased, as is the right of all pedestrians, had a right equal to that of motorists to use the street for any legitimate purpose for which public streets and roads are maintained. Of course, it is the law that a pedestrian, as well as a motorist, must exercise such reasonable care in using the streets as will protect him from injury. As has been stated, the jury were apparently amply justified in finding that the deceased in attempting to cross the street exercised proper care for his own safety. Manifestly, the driver of the truck had no right to act upon the assumption (and, as declared, the jury could well have found and impliedly did find that he did so assume) that the boy would make the crossing or get beyond the path of the truck before it reached him. The principle of law pertinent to a case such as we have here is thus stated in the case of *Burgesser* v. *Bullock's*, 190 Cal. 673, 675 [214 Pac. 649]:

"The opinion of the trial court in granting the motion for the instructed verdict is incorporated in the transcript and it appears that the trial judge was of the opinion that the decedent, having observed the approaching automobile before he entered its path, and having continually observed it thereafter, and having apparently misjudged its speed, was therefore guilty of contributory negligence. The fallacy of the conclusion reached by the trial court results from the assumption that the automobile had the right of way and that it was the duty of the pedestrian to assume that the automobile would continue in its direction without diminishing its speed or yielding to the pedestrian. The

law is that neither the pedestrian nor the automobile has a superior right of way, and that each is entitled to use the highway and that the conduct of both must be regulated with reference to this fundamental rule."

Nor is the driver of an automobile necessarily immune from liability for injuries to other persons occurring in a public street by merely showing that at the time of the accident he was running at a rate of speed of twelve miles per hour. As is said in *Reaugh* v. *Cudahy Packing Co.*, 189 Cal. 335–340 [208 Pac. 125]:

"He still remains bound to anticipate that he may meet persons at any point of the street, and he must, in order to avoid a charge of negligence, keep a proper lookout for them and keep his machine under such control as will enable him to avoid a collision with another person using proper care and caution and, if the situation requires, slow up and stop."

 The defendant complains of the following language of an instruction embraced within the court's charge to the jury:

"*You are not confined, however, in your estimate of the monetary loss to the parent to the period of minority of the child, for the relation of parent and child of course does not terminate when the child reaches its majority and thereafter there remain certain legal obligations of support that are recognized in the laws and are enforcible by appropriate legal proceedings.* For 'It is the duty of the father and mother, and the children of any poor person who is unable to maintain himself by work, to maintain such person to the extent of their ability.' *You have a right to take into consideration the probable length of life of the parent and the probability, if such you find from the evidence, that the child even after its majority might do that which the law did not require, namely, aid in the support of the parent.*"

It is the parts in italics which the defendant particularly stresses as being erroneous and prejudicial.

The specific criticism of the above language, as an instruction to the jury, is: 1. That the probable earnings of the child after reaching the age of majority and the benefits from which the father would be legally and morally entitled to receive, do not constitute an element in the legal basis upon which compensatory relief may be awarded in cases

of this character; 2. That the instruction being based upon the probable length of plaintiff's life, there was introduced no mortality tables or other evidence, other than the showing that the plaintiff was fifty-nine years of age and the deceased nine and a half years of age, upon which the jury could form a just conclusion as to the "probable length of the life of either of these persons."

That the basis of the pecuniary loss suffered by a parent from the negligent killing of a minor child includes any such loss as such parent might probably suffer, after such minor would have attained his majority, is a proposition in law thoroughly settled. This rule of law is, with great clearness, considered and approved as sound in an opinion by former Chief Justice Shaw in *Bond* v. *United Railroads*, 159 Cal. 270 [Ann. Cas. 1912C, 50, 48 L. R. A. (N. S.) 687, 113 Pac. 366]. The action in that case, as here, was by a parent for the negligent killing of her minor child, and, as here, was founded on sections 376 and 377 of the Code of Civil Procedure. The last clause of section 377 provides: "In every action under this and the preceding section (sec. 376, authorizing an action by a parent for the injury or death of a minor child), such damages may be given as, under all the circumstances of the case, may be just." Speaking of the measure of damages in actions under either of said sections the court said:

"It would seem to follow from this rule absolutely limiting the damages in every case to the pecuniary loss occasioned by the death, and upon a consideration of that justice which the statute itself invokes, that this pecuniary loss should be extended to, and should include, all pecuniary loss of every kind which the circumstances of the particular case establish with reasonable certainty will be suffered by the beneficiary of the statute in the future, because of the death of the victim. Nothing less would be a just compensation for the injury, and anything more, or anything in the realm of improbability, conjecture or mere fancy, would be beyond the purview of the statute and unjust to the defendant. In many cases where the minor is near majority, the certainty of pecuniary loss from his death, to the parent, accruing after his minority, would be as great as the certainty of such loss during minority, and the expectation of benefits for many

years thereafter would be as well established as in the case of the death of an adult. In other cases, where the child is a mere infant, the expectation of pecuniary benefits to accrue in the years following its arrival at majority would be so remote that it could not justly be made the basis for a large addition to the damages. So in the case of some adults such benefits would be exceedingly improbable. But the statute prescribes but one rule for all cases: 'Such damages may be given as under all the circumstances of the case, may be just.' The manifest effect of this language is that in all cases to which the rule applies it is to be left to the jury to say, upon a consideration of the facts, what amount is a just compensation for the financial loss which the evidence shows will probably be directed or proximately caused by the death of the victim."

In *Sneed* v. *Marysville etc. Co.,* 145 Cal. 710 [87 Pac. 379], cited approvingly in *Bond* v. *United Railroads, supra,* the court said:

"This pecuniary loss may be either a loss arising from the deprivation of something to which such heirs would have been legally entitled if the person had lived, or a loss arising from a deprivation of benefits which from all the circumstances of the particular case, it could be reasonably expected such heirs would have received from the deceased had his life not been taken, although the obligation resting on him to bestow such benefits on them may have been a *moral* obligation only." (See, also, *Peluso* v. *City Taxi Co.,* 41 Cal. App. 297, 302 [182 Pac. 808]; *Redfield* v. *Oakland etc. Co.,* 110 Cal. 277 [42 Pac. 822, 1063]; *Hillebrand* v. *Standard Biscuit Co.,* 139 Cal. 236 [73 Pac. 163]; *Johnson* v. *Southern Pac. Co.,* 154 Cal. 298 [97 Pac. 520]; *Beeson* v. *Green M. G. M. Co.,* 57 Cal. 37; *Ruppel* v. *United Railroads,* 1 Cal. App. 666 [82 Pac. 1073]; *Valente* v. *Sierra R. R. Co.,* 158 Cal. 412 [111 Pac. 95].)

There is no legal force to the point that the instruction is obnoxious to the objection that, where mortality tables in common use are not received in evidence, there can be no basis for a just consideration and fair adjustment of the element of "the present value of the reasonable benefit which the plaintiff would have received *after* his (the child's) minority and during the period of his (the plaintiff's) common expectancy of life." (*Peluso* v. *City*

*Taxi Co.*, 41 Cal. App. 297–300 [182 Pac. 808].) In that case it is said: "As to the expectation of life, that is a matter of which the courts take judicial notice," citing 20 Am. & Eng. Ency. of Law, 2d ed., p. 886; *Valente* v. *Sierra R. R. Co.*, 151 Cal. 534 [91 Pac. 481].

In *Dickinson* v. *Southern Pacific Co.*, 177 Cal. 727–730 [158 Pac. 183], the rule is thus stated: "There was no evidence offered to show the expectancy of life of a man of Dickinson's age. The courts, however, may take judicial notice of mortality tables in common use."

Again, in *Dallas* v. *De Yoe*, 53 Cal. App. 452–457 [200 Pac. 361], the court announced the rule as follows: "Appellant urges that there was no evidence as to the expectancy of life of Mrs. Dallas or as to the condition of her health. Mortality tables are admissible in such cases, *but not essential*. It is presumed that a person is in average normal health, in the absence of evidence to the contrary." (See, also, 17 C. J. 1366.)

The defendant, further assailing the charge of the court to the jury, insists that the following language contained in a certain other instruction, the subject matter of which is cognate to the proposition dealt with in the instruction first hereinabove considered, expresses an erroneous statement of the law and was prejudicial:

"In considering the question of present and future loss you should bear in mind that a verdict rendered by you is payable forthwith and that the present worth of a dollar payable or receivable at a distant future time is much less than a dollar paid to-day."

Construing that language, the counsel for the defendant declares that "the vice of the instruction," or of the language thereof just quoted herein, lies in the fact that the court thereby told the jury "that the present dollar would be worth less in the future than it would be to-day," or, in other words, that the court thereby charged "the jury that the earning powers of the deceased should be more in the future for the reason that the future purchasing power of the dollar would be less and the cost of living greater than that of to-day"; that, "therefore, the said court (by said language) in effect instructed the jury to enhance the damages in favor of respondent relative to elements of damages based upon future losses." The learned

counsel has not read the instruction correctly. The instruction, stated concisely, merely laid down the proposition that the jury, in estimating and assessing the damages to which plaintiff might be entitled by reason of the pecuniary loss he has suffered now and will suffer in the future from the killing of his minor child, should consider only the "present worth" of the dollar. This was a proper statement of the rule. In embracing in effect in the instruction the warning that the jury in estimating and assessing any damages to which the plaintiff might be entitled for present and future pecuniary loss, the jury should keep in mind the proposition that the "present worth of a dollar payable at a distant future time is much less than a dollar paid to-day," the court stated what is obviously true. The real purport of that language of the instruction, reduced to a simple form, involved only a statement to the jury that, in determining what they might satisfactorily be persuaded by the evidence that the plaintiff was entitled to by way of damages as measured in dollars and cents, they were to consider only "the present worth" of the dollar, and this is clearly what it was their duty to do. The principle underlying the proposition that the instruction was intended to submit to the jury is stated and applied in the case of *Peluso* v. *City Taxi Co., supra,* where it is said: "The recovery was not limited, of course, to the earning capacity of the son during his minority, but it included the present value of the reasonable benefit which the parents would probably have received after his majority and during the period of their common expectancy of life. (*Bond* v. *United Railroads, supra.*)"

It may be added that the instruction, as so construed, appears to be favorable rather than unfavorable to the defendant. And, further, may it be suggested that the jury, in appraising or admeasuring the compensatory relief which their verdict evidences, acted with a marked degree of moderation, considering the circumstances of the case and the deprecable result of the accident.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.